UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

CRIMINAL ACTION NO. 3:13CR-00021-JHM

UNITED STATES OF AMERICA                                                        PLAINTIFF

VS.

RENZO RAUL ASSANTE, a/k/a
FELIPE BERCKEMEYER                                                              DEFENDANT

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on a motion by Defendant, Renzo Raul Assante, to suppress all statements made to federal agents and evidence seized from his residence [DN 28]. On August 21, 2013, a evidentiary hearing was held. Fully briefed, this matter is now ripe for decision.

**I. BACKGROUND**

Defendant, Renzo Raul Assante, is charged in a five count Indictment with passport fraud; aggravated identity theft; possession of firearm by illegal alien; and two counts of making a false statement in connection with the purchase of the firearms.

On January 9, 2013, agents with the Department of Diplomatic Security Service ("DSS") placed Defendant under surveillance. The agents observed the Defendant leave his home and followed him to his place of employment, the Fiat dealership on Shelbyville Road in Louisville, Kentucky. Lead DSS Agent Lena Lee and Agent Greg Schultz entered Defendant's place of employment and asked the manager of the dealership if he recognized an individual in a photograph. The manager stated that the man in the picture was Felipe Berckemeyer, and the agents requested to speak with him. The manager directed the agents to an open break room where they interviewed Breckemeyer, later identified as Renzo Raul Assante, about his identity. At no time during the

1

interview was Defendant advised of his Miranda rights. Agent Lee described the questions as background questions to establish the identity of the person who applied for the passport. During the interview, Defendant claimed his true identity was Berckemeyer.

At the conclusion of the agent's questioning, Agent Lee asked if Assante would follow her downtime to the Immigration and Customs Enforcement ("ICE") building for fingerprinting to help validate his identity. Defendant agreed, but asked to ride with Agent Lee because his license was suspended. Three DSS agents drove Defendant downtown to the ICE facility for fingerprinting. The DSS agents followed an ICE agent who was in a second car. While Defendant was being fingerprinted, Agent Lee went to a small interview room to wait for the results. She testified that she waited in the room approximately ten minutes before Defendant entered. While in the room, the door was propped open and two other DSS agents were in and out of the room. During this time, Defendant was texting on his cell phone and chatting with the agents about his hobbies. Defendant testified that while he remembered the door to the room being open at times, he did not feel that he was free to leave. Five minutes passed before the fingerprinting results arrived.

After the fingerprinting results came back, Agent Lee began to question Defendant about his identity. Initially, Defendant repeated the story he had given at his work. Shortly after the interrogation began, Agent Lee testified that Defendant began crying and admitted that he got papers from Peru, that he did not want to go to jail, and that he couldn't go back to Peru. Defendant then requested a lawyer. Once Defendant asked to speak with a lawyer, Agent Lee testified that she read Defendant his Miranda rights and placed him under arrest. At this point, DSS Agents turned Defendant over to the ICE agents for processing. The record reflects that ICE agents continued to question Defendant.

2

At some point either before or after Defendant was arrested, he observed Agent Schultz checking in his firearm as they were being escorted through the ICE offices. Defendant asked Agent Schultz what kind of weapon he had. After Agent Schultz answered the question, Defendant told him that he liked to practice shooting and that he or his wife had a couple of guns at his home. Additionally, after Defendant was arrested, DSS agents located a business card in his possession from a local firearms dealer.

Based on the above information, Agent Dan Volk of the Bureau of Alcohol, Tobacco, Firearms, and Explosives and Agent Schultz visited Defendant's residence seeking consent to search for firearms. While knocking on the door of Defendant's residence, the agents were greeted in the driveway by Martha Puche, Defendant's wife. The agents introduced themselves to her and explained why they were there. Agent Volk requested consent to search the house and vehicle for firearms, and Puche gave verbal consent. Puche later signed a written consent to search form and showed the agents where the firearms were kept in a bedroom closet in a gun case. At some point, Puche's father advised her to call her husband's attorney. Puche then called the attorney who had been appointed to represent her husband. After talking to the lawyer, Puche withdrew her consent and the agents terminated the search. As a result of the search, law enforcement officers seized three firearms and other related materials.

Defendant now moves to suppress his statements made to DSS and ICE agents and the evidence seized from his residence. The United States represents that it does not intend to introduce any evidence obtained from Defendant's interview with the ICE agents. The United States objects to the remaining issues raised in the motion to dismiss arguing that the initial questioning of the Defendant was non-custodial and did not require Miranda warnings. Further, the United States

3

maintains that law enforcement officers obtained a valid and knowing consent to enter Defendant's residence where they lawfully located and seized several firearms.

## II. DISCUSSION

### 1. Miranda Warning

The Fifth Amendment privilege against self-incrimination is implicated whenever an individual is "taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning." Miranda v. Arizona, 384 U.S. 436, 478 (1966). Because custodial interrogations are said to be inherently coercive, Miranda established that a suspect must be apprised of certain rights to protect the privilege against self-incrimination. Id. at 444. See Dickerson v. United States, 530 U.S. 428, 435 (2000). However, a suspect may waive his Miranda rights "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444. The obligation to administer a Miranda warning to a person only arises when an individual is in custody. "For an individual to be 'in custody,' there must be 'a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.'" United States v. Mahan, 190 F.3d 416, 421 (6th Cir. 1999)(citing Thompson v. Keohane, 516 U.S. 99, 102 (1995)). See also United States v. Swanson, 341 F.3d 524, 528 (6th Cir. 2003).

"A situation is viewed as custodial if an objective consideration of the totality of the circumstances would lead 'a reasonable man in the suspect's position' to believe that his freedom was restrained." United States v. Slone, 2013 WL 3799419, *11 (E.D. Ky. July 19, 2013) (quoting Berkemer v. McCarty, 468 U.S. 420, 442 (1984); Thompson, 516 U.S. at 112–13 ). "The test must be not what the defendant himself . . . thought, but what a reasonable man, *innocent of any crime*, would have thought had he been in the defendant's shoes." United States v. Sharp, 680 F. Supp. 2d

4

895, 900 (E.D. Tenn. 2010) (quoting United States v. Galloway, 316 F.3d 624, 629 (6th Cir. 2003)). The Sixth Circuit has pointed to several factors to guide a court's analysis in deciding whether an interrogation is custodial in nature: "(1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions." Slone, 2013 WL 3799419, *11 (citing United States v. Hinojosa, 606 F.3d 875, 883 (6th Cir. 2010); United States v. Panak, 552 F.3d 462, 465 (6th Cir. 2009); United States v. Swanson, 341 F.3d 524, 529 (6th Cir. 2003); United States v. Salvo, 133 F.3d 943, 950 (6th Cir. 1998)).

**A. Work Place**

Based on the facts in the present case, the Court finds that Defendant was not in custody when the agents spoke to him at his place of employment. Defendant was never advised that he was under arrest and there is no indication that Defendant's freedom of movement was restrained. Furthermore, the place of the questioning was not hostile or coercive. See Mahan, 190 F.3d at 421-422 (detainee not "in custody" where questioning took place at work and he was summoned to the interview by one of his supervisors at work). The questioning took place in a break room at Defendant's place of employment with the door unlocked. The interview lasted only a few minutes. Further, Agent Lee and Agent Schultz "at no time made any show of force or brandished a firearm or handcuffs, or any other equipment ordinarily associated with formal arrest or custody." Mahan, 190 F.3d at 422. Finally, when Agent Lee requested Defendant come downtown for fingerprinting, she suggested that he follow the agents in his own vehicle. "[N]othing suggests that a reasonable person in his position would not have felt free to terminate the interview at any time." Id. Therefore, no Miranda warnings were required prior to Defendant's questioning by the Agents at his work.

5

### B. ICE Facility

In contrast, the Court finds that Defendant was in custody when the agents spoke to him at the ICE facility about the fingerprint results. Agent Lee testified that once she received the fingerprint results, she did not apprise Defendant of his <u>Miranda</u> rights. Instead, she confronted the Defendant about the results and told him: "You need to tell me the truth." (Hearing Transcript at 13, 28.) At this point, Defendant was aware that DSS and ICE had received the fingerprint results revealing his true identity. Additionally, when the questioning began, Defendant was located in a highly restricted facility in a room with multiple DSS and ICE agents one of whom was instructing the Defendant to tell her the truth. At no time during the process was Defendant informed that he did not need to answer any questions. Considering the totality of the circumstances, the Court finds that a reasonable person in Defendant's position would believe that his freedom was restrained at the time of the questioning. <u>Berkemer</u>, 468 U.S. at 442. In fact, Agent Lee admitted that once she received the fingerprint results, Defendant was not free to leave. (Transcript Hearing at 29.) Accordingly, Defendant's statements made at the ICE facility to Agent Lee and other agents in response to the agents' questions were made without the benefit of a <u>Miranda</u> warning; and as a result, those statements are suppressed.

### C. Statements Regarding Firearms

With respect to Defendant's statement regarding the firearms, both the Defendant and Agent Schultz testified at the hearing that the Defendant initiated the conversation about the firearms. Defendant testified that he asked the agent what kind of firearm he carried. After the agent answered the question, Defendant testified that he stated that his wife has a .45 and a 9 mm because they liked to go practice shooting. Similarly, Agent Schultz confirmed that while locking away his

firearm, Defendant asked him what kind of firearm he carried. Agent Schultz testified that after Schultz answered, Defendant told him that he liked to go practice shooting and that he possessed a couple of firearms at home.

According to both the testimony of Defendant and Agent Schultz, the Defendant initiated the conversation regarding the firearms and volunteered the information about his gun usage without provocation. Because Defendant's statements were made voluntarily and were not in response to law enforcement questioning, they are not subject to Miranda. See, e.g. Stanley v. Wainwright, 604 F.2d 379, 382 (5th Cir. 1979)("Miranda was designed to curb unfair methods of custodial interrogation; it does not protect spontaneous utterances made by detainees . . . .") Accordingly, the Court denies Defendant's motion to suppress the other statements made at his work or the statement made to law enforcement regarding the firearms. The Court grants Defendant's motion to suppress his statements made to the DSS and ICE Agents made while at the ICE facility.

### 2. Search of Home

The Fourth Amendment prohibits searches without a warrant except in limited circumstances, such as when the search is conducted with consent. In order to justify a search by consent, "the government must prove by 'clear and positive testimony' that the asserted consent was 'voluntary' and 'unequivocally, specifically, and intelligently given.'" United States v. Buckingham, 433 F.3d 508, 514 (6th Cir. 2006)(quoting United States v. Worley, 193 F.3d 380, 385-86 (6th Cir.1999)). "The question of whether a consent to search is voluntary and knowing is a question of fact to be determined from the totality of all the circumstances." United States v. Abdullah, 162 F.3d 897, 902 (6th Cir.1998). Additionally, "a person who consents to a warrantless search has the right to restrict the scope of the search." United States v. Tatman, 397 Fed. Appx.

7

152, 162 (6th Cir. 2010) (citing Florida v. Jimeno, 500 U.S. 248, 252 (1991)). "This includes the concomitant right of the consenting party to withdraw his or her consent once the search has begun." Id. (citing United States v. Buckingham, 433 F.3d 508, 513 (6th Cir. 2006); Painter v. Robertson, 185 F.3d 557, 567 (6th Cir. 1999) ("[T]he consenting party may limit the scope of [the] search, and hence at any moment may retract his consent.")). The Sixth Circuit instructs that upon such a revocation, a previously valid consensual search "'should [be] terminated instantly' and 'the officers should . . . promptly depart[ ] the premises (assuming they possess[ ] no independent legal authority to remain).'" Id. (quoting Painter, 185 F.3d at 567.)

The record reflects that Defendant's wife Martha Puche consented, both verbally and in writing, to the search of the residence and her vehicle. Not only did she grant consent, but she also took the agents to location of the subject firearms. Agent Volk testified that as a result of her directing the agents to the firearms located in the gun safe in the bedroom, the agents did not search any other rooms of the home. Within 20 to 30 minutes of when Puche gave the consent to search, she withdrew her consent. The agents terminated the search and left the home. At the hearing, Agent Volk testified that at the time of her withdrawal of the consent to search, "[t]he firearms had already been seized. I'm not sure whether they had been removed from the house already or not, but we already knew about them. We had them. They were in our custody at that point anyhow." (Hearing Transcript at 67.)

Defendant concedes that Puche initially consented to the search of the residence. However, Defendant argues that the agents violated the Fourth Amendment by removing the firearms from the residence after Puche revoked her consent. Defendant contends that this conduct warrants suppression of the firearms and any other evidence seized. The Court disagrees. Even assuming

8

for purposes of this motion, that the firearms were removed from the residence after Puche withdrew her consent, courts have held that "evidence discovered during a lawful, consensual search is not suppressed retroactively when the consent is terminated." United States v. Guerrero, 129 F.3d 611, *3 (5th Cir. Oct. 22, 1997)(citing United States v. Guzman, 852 F.2d 1117, 1122 (9th Cir. 1988) ("evidence found before [consent] revocation will not be suppressed"); United States v. Jachimko, 19 F.3d 296, 299 (7th Cir.1994) ( "where a suspect does not withdraw his valid consent to a search for illegal substances *before* they are discovered, the consent remains valid and the substances are admissible as evidence")). It is uncontested that immediately after Puche's consent to search she directed the agents to the location of the firearms in question. Clearly, prior to the withdrawal of her valid consent, the agents had located the firearms in question and had at the very least begun to process them. Further, Agent Volk testified that once Puche withdrew her consent to search the home, the agents terminated the search of the bedroom and departed the premises. For these reasons, the Court finds that the search and seizure of the firearms did not violate the Fourth Amendment, and Defendant's motion to suppress is denied.

### III. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that the motion by Defendant, Renzo Raul Assante, to suppress all statements made to federal agents and evidence seized from his residence [DN 28] is **GRANTED IN PART AND DENIED IN PART**. The Court suppresses the statements Defendant made to Agent Lee and other agents as a result their interrogation of Defendant at the ICE office. The remaining statements of Defendant and evidence seized at his residence are properly admissible.

cc: counsel of record

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

September 25, 2013

9